# UNITED STATES DISTRICT COURT

for the
Western District of Oklahoma

| In the Matter of the Search of | ) | |
|---|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.   MJ-24-126-STE |
| ELECTRONIC DEVICE: Black Samsung S23 Ultra, IMEI: 351364394248343, seized from RYAN RUDICK | ) ) ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A, which is attached and incorporated by reference herein.

located in the _____Western_____ District of _____Oklahoma_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, which is attached and incorporated by reference herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. s. 2252A(a)(5)(B) | Possession of Materials Containing Child Pornography |
| 18 U.S.C. s. 2251(a) and (e) | Sexual Exploitation of a Minor |

The application is based on these facts:

See attached Affidavit of FBI SA Steve Carrick, which is incorporated by reference herein.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

Steve Carrick, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date:   **Feb 12, 2024**

City and state:   **Lawton, OK**

_____
*Judge's signature*

SHON T. ERWIN, U.S. MAGISTRATE JUDGE
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Steven Carrick, a Special Agent of the Federal Bureau of Investigation ("FBI"), Oklahoma City Division, being duly sworn, state:

## INTRODUCTION

1.       I am submitting this Affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device: a **black Samsung S23 Ultra, IMEI 351364394248343, seized from RYAN RUDICK** (hereinafter the "**TARGET CELL PHONE**"), as further described in Attachment A of this Affidavit, which is incorporated into this Affidavit by reference. The FBI in Oklahoma City has custody of the **TARGET CELL PHONE** in Oklahoma City, Oklahoma. I am submitting this Affidavit in support of a search warrant authorizing a search of the **TARGET CELL PHONE** for the items specified in Attachment B of this Affidavit, wherever they may be found, and the extraction from that property of electronically stored information, as further described in Attachment B of this Affidavit, as instrumentalities, fruits, and evidence of the subsequently-mentioned crimes.

2.       I have been employed as a Special Agent with the FBI since February 2022 and have been assigned to the Oklahoma City Division of the FBI since June 2022. I completed four months of training at the FBI Academy in Quantico, Virginia. During the training, I received instruction in a variety of investigative techniques commonly used in support of a wide range of the FBI's investigative priorities. The training included instruction regarding the use of confidential human sources, electronic and physical surveillance techniques, law enforcement tactics, search and seizure laws and techniques, interviewing strategies and skills,

forensic techniques, and a variety of other subjects. As a federal agent, I am authorized to investigate violations of laws of the United States, and I am a law enforcement officer with the authority to execute warrants issued under the authority of the United States. Prior to my employment with the FBI, I was a Police Officer in Nashville, Tennessee for nine years. I spent four of those years investigating crimes against children, to include physical abuse, sexual abuse, and homicide.

3.     The facts set forth in this Affidavit are based upon my personal observations, my training and experience, reports provided to me by other law enforcement officers, and statements made by witnesses and other concerned parties. Since this Affidavit is being submitted for the limited purpose of establishing probable cause for the requested warrant, I have not included each and every fact known to me concerning this investigation. Based on the facts set forth in this Affidavit, I assert there is probable cause to believe that contraband and evidence of a crime, fruits of a crime, and instrumentalities of violations of 18 U.S.C. §§ 2252(a)(2) and (b)(1) (distribution and/or receipt of a visual depiction of a minor engaged in sexually explicit conduct); 18 U.S.C. §§ 2252(a)(4)(B) and (b)(2) (possession of and access with intent to view a visual depiction of a minor engaged in sexually explicit conduct); 18 U.S.C. §§ 2252A(a)(2)(A) and (b)(1) (distribution and/or receipt of child pornography (and attempt)); and 18 U.S.C. §§ 2252A(a)(5)(B) and (b)(2) (possession of and access with intent to view child pornography (and attempt)) are presently located within the **TARGET CELL PHONE**.

## DEFINITIONS

4.      The following definitions apply to this Affidavit and Attachment B:

a.      "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do not necessarily depict minors in sexually explicit poses or positions.

b.      "Child pornography," as defined in 18 U.S.C. § 2256(8), is any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

c.      "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones, and mobile phones and devices. *See* 18 U.S.C. § 1030(e)(1).

d.      "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including central processing

3

units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

e.     The "Internet" is a global network of computers and other electronic devices that communicate with each other.   Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

f.     "Internet Protocol address" or "IP address," as used herein, refers to a unique number used by a computer or other digital device to access the Internet.   IP addresses can be "dynamic," meaning that the internet service provider assigns a different unique number to a computer every time it accesses the Internet.   IP addresses might also be "static," if an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet.

g.     "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet.   ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.

h.    "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

i.    "Records," "documents," and "materials," as used herein, include all information recorded in any form and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

j.    "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any person.

k.    "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

## BACKGROUND ON KIK MESSENGER

5.    In a nutshell, KIK Messenger, commonly called KIK, is a freeware instant messaging mobile app from the Canadian company KIK Interactive, available free of charge on iOS and Android operating systems. KIK allows its users to talk to their friends and browse and share photos and videos and other files with their friends on KIK. KIK was founded in 2009 by a group of University of Waterloo students who started a company designed to shift the center of computing from the PC to the phone. According to the website, KIK Messenger,

5

a free service easily downloaded from the Internet, has become the simplest, fastest, most life-like chat experience you can get on a smartphone. Unlike other messengers, KIK usernames, not phone numbers, are the basis for KIK user accounts, so KIK users can control with whom they communicate. In addition, KIK features include more than instant messaging. KIK users can exchange images, videos, sketches, stickers, and more with mobile web pages.

6.     KIK users are also able to create chat groups with a limited number of individuals to communicate in a group setting and exchange text messages, images and videos. These groups are administered by the group creator who has the authority to remove and ban other users from the created group. Once the group is created, KIK users have the option of sharing a link to the group that includes all of their contacts or any other user. These groups are frequently created with a group name containing a hashtag (#) that is easily identifiable or searchable by keyword.

7.     The KIK mobile application is available for download via the App Store for most iOS devices such as iPhones and iPads. Additionally, the KIK mobile application is available on the Google PlayStore for Android devices. KIK can be used on multiple mobile devices, to include cellular phones and tablets.

8.     In general, providers like KIK ask each of their subscribers to provide certain personal identifying information when registering for an account. This information can include the subscriber's full name, physical address, and other identifiers such as an e-mail address.

9.     Providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations,

the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account, and other log files that reflect usage of the account. In addition, providers often have records of the IP address used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the account.

10.    KIK offers users the ability to create an identity within the mobile application referred to as a "username." This username is unique to the account and cannot be changed. No one else can utilize the same username. A KIK user would have to create a new account in order to obtain a different username. The username for a particular KIK account holder is displayed in their KIK profile.

11.    According to information provided to HSI by a KIK Law Enforcement Response Team Lead, KIK's Terms of Service prohibit KIK users from uploading, posting, sending, commenting on, or storing content that contains child pornography and/or child abuse images. The Terms of Service also provide that KIK may review, screen, and delete user content at any time if KIK believes use of their services are in violation of the law. According to KIK, KIK has a strong business interest in enforcing their Terms of Service and ensuring that their services are free of illegal content, and in particular, child sexual abuse material. Accordingly, KIK reports that it independently and voluntarily takes steps to monitor and safeguard their platform and that ridding KIK products and services of child abuse images is critically important to protecting their users, product, brand, and business interests.

12.    KIK was located in Ontario, Canada and was governed by Canadian law.

13.     According to information contained in the "KIK Interactive, Inc. Child Sexual Abuse and Illegal Material Report and Glossary" (hereinafter KIK Glossary), which KIK provided when reporting information to law enforcement authorities, KIK was mandated to report to the Royal Canadian Mounted Police (RCMP) any images and/or videos that would constitute suspected child pornography under Canadian law which are discovered on the KIK platform.    According to the KIK Glossary, KIK is typically alerted to suspected child pornography on KIK based on digital hash value matches to previously identified child pornography or through reports from other KIK users or third-party moderators.

14.     The RCMP advised HSI agents that upon receiving a report from KIK related to suspected child pornography, the RCMP reviewed the reported IP addresses of the KIK users contained in the KIK reports to determine their location.  The RCMP then provided KIK reports of KIK users in the United States to HSI in Ottawa, Canada, who in turn provided the KIK reports to the HSI Cyber Crimes Center (C3) Child Exploitation Investigations Unit (CEIU) located in Fairfax, Virginia for analysis and dissemination.

15.     In October 2019, KIK was purchased by MediaLab, a company operating in the United States.

## BACKGROUND OF THE INVESTIGATION

16.     On January 16, 2024, an FBI Online Covert Employee ("OCE"), in Jacksonville, Florida was connected to the Internet in an undercover capacity.  The OCE connected with a KIK user with username "RyanPipeliner" (hereinafter, the SUBJECT ACCOUNT"), using screenname "R !" who was found to have a sexual interest in children.

17.     During the course of this online undercover session, the SUBJECT ACCOUNT

8

shared three photos with the OCE that were taken in the same bathroom, of an unknown Caucasian female, with light brown to dark blonde hair, with her breasts, buttocks, and vaginal area exposed. In two of the photos, the female's breasts were fully exposed. In one of the photos, the female's buttocks are fully exposed. The female's vaginal area was displayed in one of the photos where her breasts were also exposed. It did not appear the female was aware the photos were being taken. The FBI OCE commented, "Hey nice hidden cam pics." **RUDICK** replied, "More like videos that I took still from [laughing emoji] thanks." Furthermore, the SUBJECT ACCOUNT stated it was his minor step-daughter.

18.     Agents issued an emergency disclosure request to KIK and requested any IP logs for user information related to the SUBJECT ACCOUNT. The results identified that the SUBJECT ACCOUNT utilized IP address 174.210.0.33 on January 16, 2024 at 15:08:02 CST.

19.     Law enforcement determined that the IP address belonged to Verizon. Agents issued a subpoena to Verizon for subscriber information regarding the SUBJECT ACCOUNT. The results from Verizon identified that IP address 174.210.0.33, which was utilized on January 16, 2024 at 15:08:02 CST, resolved to the account of **RUDICK**, whose listed address is 1924 West Carolina Ave, Chickasha, Oklahoma 73018 (the SUBJECT PREMISES) and listed phone number is 918-315-1943.

20.     Subsequent investigation revealed that **RUDICK** has a 15-year-old step-daughter, which is supported by local school records. Furthermore, school records list the child's mother as Tara Trembath Rudick. Upon a social media search, agents were able to locate photographs of **RUDICK**'s 15-year-old step-daughter, who was a Caucasian female, with light brown to dark blonde hair, who visually matches the female in the photos he shared

9

on KIK. Law enforcement thus identified **RUDICK** as a suspect in its investigation of the user of the SUBJECT ACCOUNT who distributed child pornography to the OCE on January 16, 2024.

21.     Upon execution of a search warrant at the SUBJECT PREMISES on February 2, 2024, it was discovered that **RUDICK** was out of town for work in Foley, Missouri. **RUDICK** was alerted to the fact of the FBI's residential search and requested a meeting with FBI agents at a local police department. Special Agents from the FBI, St. Louis Division, met with **RUDICK** at the Wentzville Police Department in Wentzville, Missouri for an interview on February 2, 2024. During the interview, **RUDICK** admitted that he deleted a text message just prior to providing agents with the **TARGET CELL PHONE**. **RUDICK** then signed a Consent to Search.

22.     Additionally, after the interview was complete, a pop-up message appeared on the **TARGET CELL PHONE**. The message indicated that someone was attempting to remotely access the **TARGET CELL PHONE**. Interviewing agents did not have enough time to document the entire pop-up message but noticed that the email address associated with the pop-up message appeared to contain the name "Ryan." I suspect the remote user was attempting to wipe the **TARGET CELL PHONE**. Interviewing agents immediately placed the **TARGET CELL PHONE** in airplane mode and battery-saving mode to avoid the opportunity to wipe the device.

23.     The **TARGET CELL PHONE** is currently located in secure evidence storage at the FBI Oklahoma City Division. Based on my training and experience, I know that the **TARGET CELL PHONE** has been stored in a manner in which its contents are—to the extent

material to this investigation—in substantially the same state as it was when the **TARGET CELL PHONE** first came into the possession of the FBI.

24.    Based on my training, experience, and research, I know that the **TARGET CELL PHONE** has capabilities that allows it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and personal digital assistant ("PDA").  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

25.    An examination can reveal the approximate location of the **TARGET CELL PHONE** and the user by associating a specific date and time with: historical GPS data, historical cell-site data, and logs of Wi-Fi networks.  Additionally, an examination can reveal the **TARGET CELL PHONE** unique identifiers (phone number, IMEI, IMSI, etc.).  These unique identifiers can be used to compel material records from the cell phone service provider such as call logs, billing information, and historical cell-site data.

## BACKGROUND ON CHILD PORNOGRAPHY, COMPUTERS, AND THE INTERNET

26.    I have had both training and experience in the investigation of computer-related crimes.  Based on my training, experience, and knowledge, I know the following:

27.    Computers and digital technology are the primary way in which individuals interested in child pornography interact with each other. Computers basically serve four functions in connection with child pornography: production, communication, distribution, and storage.

28.    Digital cameras and smartphones with cameras save photographs or videos as a

digital file that can be directly transferred to a computer by connecting the camera or smartphone to the computer with a cable or via wireless connections, such as "Wi-Fi" or "Bluetooth." Photos and videos taken on a digital camera or smartphone may be stored on a removable memory card in the camera or smartphone. These memory cards are often large enough to store thousands of high-resolution photographs or videos.

29.    A device known as a modem allows any computer to connect to another computer using a telephone, cable, or wireless connection. Mobile devices such as smartphones and tablet computers may also connect to other computers via wireless connections. Electronic contact can be made to literally millions of computers around the world. Child pornography can therefore be easily, inexpensively, and anonymously (through electronic communications) produced, distributed, and received by anyone with access to a computer or smartphone.

30.    The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography.   Electronic storage media of various types – to include computer hard drives, external hard drives, CDs, DVDs, and "thumb," "jump," or "flash" drives, which are very small devices plugged into a port on the computer – can store thousands of images or videos at very high resolution. It is extremely easy for an individual to take a photo or a video with a digital camera or camera-bearing smartphone, upload that photo or video to a computer, and then copy it (or any other files on the computer) to any one of those media storage devices. Some media storage devices can easily be concealed and carried on an individual's person. Smartphones and/or mobile phones are also often carried on an individual's person.

31.    The Internet affords individuals several different venues for obtaining,

viewing, and trading child pornography in a relatively secure and anonymous fashion.

32. Individuals also use online resources to retrieve and store child pornography. Some online services allow a user to set up an account with a remote computing service that may provide e-mail services and/or electronic storage of computer files in any variety of formats. A user can set up an online storage account (sometimes referred to as "cloud" storage) from any computer or smartphone with access to the Internet. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer, smartphone, or external media in most cases.

33. As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional (*i.e.*, by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files). Digital information can also be retained unintentionally, such as the traces of the path of an electronic communication, which may be automatically stored in many places (*e.g.*, temporary files or ISP client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Such information is often maintained indefinitely until overwritten by other data.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

34. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

35.    I assert there is probable cause to believe that things that were once stored on the **TARGET CELL PHONE** may still be stored there, for at least the following reasons:

    a.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

    b.    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

36.    *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **TARGET CELL PHONE** was used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the **TARGET CELL PHONE** because:

14

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their uses, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

15

e.   Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

37.    *Nature of examination.*    Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **TARGET CELL PHONE** consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the **TARGET CELL PHONE** to human inspection in order to determine whether it is evidence described by the warrant.

38.    *Manner of execution.*    Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for this Court to authorize the execution of the warrant at any time in the day or night.

## **CONCLUSION**

39.    I submit that this Affidavit supports probable cause for a search warrant authorizing the examination of the **TARGET CELL PHONE** described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

Steven Carrick
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on February __12__, 2024.

SHON T. ERWIN
UNITED STATES MAGISTRATE JUDGE

17

## ATTACHMENT A

The property to be searched is described as: a **black Samsung S23 Ultra, IMEI 351364394248343, seized from RYAN RUDICK** (hereinafter the "**TARGET CELL PHONE**"). The **TARGET CELL PHONE** is currently located in secure evidence storage at the FBI in Oklahoma City, located at 3301 W Memorial Road, Oklahoma City, Oklahoma. This warrant authorizes the forensic examination of the **TARGET CELL PHONE** for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.      All records on the **TARGET CELL PHONE** described in Attachment A that relate to violations of 18 U.S.C. §§ 2252(a)(2) and (b)(1) (distribution and/or receipt of a visual depiction of a minor engaged in sexually explicit conduct); 18 U.S.C. §§ 2252(a)(4)(B) and (b)(2) (possession of and access with intent to view a visual depiction of a minor engaged in sexually explicit conduct); 18 U.S.C. §§ 2252A(a)(2)(A) and (b)(1) (distribution and/or receipt of child pornography (and attempt)); and 18 U.S.C. §§ 2252A(a)(5)(B) and (b)(2) (possession of and access with intent to view child pornography (and attempt)), involving **RYAN RUDICK**, including:

   a. Evidence of who used, owned, or controlled the **TARGET CELL PHONE** at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

   b. Evidence of software that would allow others to control the **TARGET CELL PHONE**, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

   c. Evidence of the lack of such malicious software;

   d. Evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to the crime(s) under investigation and to the computer user;

e.  Evidence indicating the computer user's knowledge and/or intent as it relates to the crime(s) under investigation;

f.  Evidence of the attachment to the **TARGET CELL PHONE** of other storage devices or similar containers for electronic evidence;

g.  Evidence of programs (and associated data) that are designed to eliminate data from the **TARGET CELL PHONE**;

h.  Evidence of the times the **TARGET CELL PHONE** was used;

i.  Passwords, encryption keys, and other access devices that may be necessary to access the **TARGET CELL PHONE**;

j.  Documentation and manuals that may be necessary to access the **TARGET CELL PHONE** or to conduct a forensic examination of the **TARGET CELL PHONE**;

k.  Records of or information about Internet Protocol addresses used by the **TARGET CELL PHONE**;

l.  Records of or information about the **TARGET CELL PHONE**'s Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

m.  Contextual information necessary to understand the evidence described in this attachment.

2

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic, video, or audio form.

3